UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION

*Eastern District of Kentucky*
**F I L E D**
AUG 0 8 2018
AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Scott Crum, RN <br><br> Plaintiff, <br><br> AIR METHODS CORPORATION <br><br> Defendant. | CIVIL ACTION NO. *18 · 43 - GFVT* <br><br> **FILED IN CAMERA AND UNDER SEAL** <br> Pursuant to 31 U.S.C. § 3730(b)(2) <br><br> **JURY TRIAL DEMANDED** |

* * * * * * * *

## VERIFIED QUI TAM COMPLAINT AND JURY TRIAL DEMAND

**COMES NOW**, through the undersigned counsel, Relator Scott Crum, on behalf of himself and the United States of America ("United States"), and brings this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") to recover monetary damages, civil penalties, and all other remedies for fraud and other violations against federal health care programs, which include Medicare, Medicaid, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS/TRICARE"), the Veterans Administration, the Federal Employee Health Benefits, and all others (collectively, "federal health care programs"), and hereby alleges as follows:

## I.   NATURE OF THE ACTION

1.   The FCA allows a private person with knowledge of a fraud against federal agencies or programs to bring an action in federal district court for himself and for the United States and States and to share in any recovery. Such an action is known as a *qui tam*,

which is derived from the Latin phrase, *qui tam pro domino rege quam pro se ipso in hac parte sequitur* ("who as well for the king as for himself sues in this matter"). The party bringing such a suit is known as a Relator.

2. In this *qui tam*, Relator alleges that Air Methods Corporation, itself and through its various affiliates (collectively "Air Methods"), since at least 2008, knowingly and systematically defrauded the federal health care programs by submitting false claims seeking payment for air ambulance transport services that were not reasonable, medically necessary, or covered by those programs. Air Methods' fraudulent scheme focused on (but was not limited to) fraudulently submitting claims and fraudulently receiving payment from federal health care programs for the air ambulance transportation of patients who were stable or were not suffering from medical conditions that justified air ambulance transport. Put simply, Air Methods created a system and a corporate culture whereby patients for whom air ambulance services were neither medically necessary nor reasonable were nevertheless transported via air ambulance. Claims connected with such unnecessary and unreasonable flights were falsely submitted to federal health care programs and false records were created to disguise those false claims and to ensure that Air Methods got paid for the air ambulance flights despite the fact that federal health care programs do not pay for such unreasonable and unnecessary air ambulance services.

3. Air Methods pressured and trained its air ambulance flight crews to be excessively inclusive in deciding which patients were in need of expensive air ambulance services, to falsify medical documentation to obfuscate patients' true medical conditions, and to record misleading and untrue diagnoses and other jargon designed to falsely justify air ambulance transports that were not otherwise reasonable or medically necessary.

4.     Consistent with this training and corporate culture of fraud, patient medical records were produced that did not accurately represent patients' true medical conditions before, during, and after air ambulance flights.   Similar records were created to falsely memorialize other information, such as environmental factors like traffic gridlock or proximity to suitable care centers that could justify or cover up otherwise unnecessary and unreasonable air ambulance flights.   These false records later acted as the underpinnings of fraudulent claims that Air Methods submitted or caused to be submitted to federal health care programs.

5.     The scheme was – and, due to its ongoing nature, is – nationwide in scope, reaching not only the Eastern District of Kentucky but also at least 48 of the 50 United States.[1]  Relator estimates that approximately 60 to 70% of the air ambulance flights that he has personally witnessed were not medically necessary or reasonable under prevailing federal health care program standards.  Based upon review of records and interaction with other Air Methods employees, Relator knows that improper flights occur on other flight crews as well. Because Air Methods initially bills tens-of-thousands of dollars *per flight* for air ambulance services, upon information and belief, this scheme has resulted in loss to federal health care programs in excess of hundreds of millions of dollars.

## II.   <u>JURISDICTION AND VENUE</u>

6.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33.  This Court possesses subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.  This Court also has jurisdiction pursuant to 31 U.S.C. § 3732(a), in that at all times

---

[1] *See https://www.airmethods.com/about-us* -- Air Methods' "About Us" link on its official website.  ("We are ready to save lives at every moment of every day, with over 300 bases of operations serving 48 states.") Site last visited August 2, 2018.

relevant to this Complaint Air Methods transacted business within the Eastern District of Kentucky.

7.      This Complaint is filed within the period prescribed by 31 U.S.C. § 3731(b). There was no public disclosure of the allegations or transactions set forth in this action prior to filing under 31 U.S.C. § 3730(e).

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).   The Defendant can be found in, resides, transacts or has transacted, or is qualified to do business in this District.   In addition, during the period challenged by this action, the Defendant operated flight bases in Mt. Sterling, London, Somerset, and Frankfort, Kentucky and regularly conducted business throughout this judicial district, including the air ambulance flights described herein.

## III.   PARTIES

### A.  Plaintiff

9.      Plaintiff United States of America brings this action by and through its administrative agency, the United States Department of Health and Human Services ("HHS"), Centers for Medicare & Medicaid Services ("CMS"), which is responsible for the administration of all federal health care programs.   At all times relevant to this Complaint, the United States funded the provision of medical care for eligible patients of Air Methods pursuant to the Medicare program and other programs administered by CMS.

### B.  Relator

10.      Relator Scott Crum is a United States citizen.   He received his associate's degree in Applied Science from the University of Kentucky.   Mr. Crum is a Registered Nurse (RN) and holds the following health care certifications: Advanced Cardiac Life Support;

Pediatric Advanced Life Support; Neonatal Resuscitation; Basic Life Support; and Certified Emergency Nurse. He has trained other medical professionals, including physicians, in Advanced Cardiac Life Support and Trauma Nurse Core Curriculum. Mr. Crum has been a registered nurse for 24 years. He has treated patients in emergency and critical care settings throughout his career and has approximately 700 hours of advanced or continuing education beyond his degree

11.    Mr. Crum currently works as a "senior regional float nurse" for Air Methods. As part of his duties, he serves on air ambulance flight crews that treat and transport patients for Air Methods. By virtue of his work, Mr. Crum became aware of the company's systemic practice of creating false records and falsely billing for the unreasonable and medically unnecessary air ambulance transports outlined in this Complaint. Mr. Crum estimates that, since his employment began with Air Methods in 2008, he has participated in approximately 500 air ambulance flights collectively across Kentucky, Michigan, Ohio, Tennessee, Indiana, New Mexico, Arizona, Colorado, Texas, Georgia, and New York.

12.    Aside from participating in air ambulance flights as a nurse, Mr. Crum was assigned additional duties by Air Methods management in March 2018. These additional duties included conducting in-house reviews of flights, patient charts, and associated records.

**C. Defendant**

13.    Air Methods Corporation is a Delaware corporation that was registered on April 10, 1987. Its stock was traded on the NASDAQ as AIRM until its acquisition by a private equity firm in 2017. Its corporate headquarters are located at 7211 South Peoria, Englewood, Colorado 80112. Air Methods operates or is affiliated with a variety of related limited liability companies, corporations, holding companies, and the like. For example, in

Delaware, alone, there exist at least five other "Air Methods" companies, including Air Methods Acquisition Sub, Inc.; Air Methods Telemedicine, LLC; Air Methods Tours, Inc.; Air Methods Transport Company; and Air Methods Worldwide, Inc.  Air Methods operates in at least 48 states in the United States and uses similar affiliated companies in each of those states.[2]  In 2009, it received a Certificate of Authority to operate in the Commonwealth of Kentucky from the Kentucky Secretary of State.  Air Methods' official web site touts its "over 300 bases of operations serving 48 states," "150,000 flight hours," "100,000" patient transports, and "over 4,500 team members answering the call."[3]  Air Methods describes its Air Medical Services Division as "the largest provider of air medical transport services in the United States."[4]

14.     Air Methods presently operates nine air bases that service Kentucky, four of which are situated in the Eastern District of Kentucky.  Those bases are located in Mt. Sterling, London, Somerset, and Frankfort.  In the past, Air Methods has operated as many as ten air bases in Kentucky.  Upon information and belief, Air Methods' Hazard, Kentucky air base was shut down because, given the socioeconomic demographics of that base's catchment area, nearly all of the air ambulance flights were for Medicaid or Medicare patients.  This circumstance threatened company profits because those governmental payors pay deeply discounted rates for flights when compared to private insurers.

15.     A March 14, 2017 press release on Air Methods' web site states:

> Air Methods Corporation (NASDAQ: AIRM), a global leader in air medical transportation and air tourism, today announced that it has entered into a definitive agreement to be acquired by affiliates of American Securities LLC. Under the terms of the agreement, affiliates of American Securities

---

[2] *Id.*
[3] *Id.*
[4] *See https://www.airmethods.com/newsroom/2017/03/14/air-methods-enters-into-definitive-agreement-to-be-acquired-by-american-securities-for-$43.00-per-share-in-cash.*  Site last visited August 2, 2018.

will acquire all outstanding shares of Air Methods for $43.00 per share in cash. This represents a 20.4% premium to Air Methods' stock price of $35.70 on January 31, 2017 prior to press speculation regarding a sale, and a 24.7% premium to 30-day volume-weighted average price of $34.49 as of the same date. The transaction, which was unanimously approved by Air Methods' Board of Directors, has a total enterprise value of approximately $2.5 billion, including net debt.[5]

## IV.   FEDERAL HEALTH CARE PROGRAMS

16.    "Federal health care program" is defined in the Medicare fraud and abuse statute as:

> (1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government . . .; o r ,
>
> (2) any State health care program, as defined in section 1320a-7(h) . . .

42 U.S.C. § 1320a-7b(f).

17.    Federal health care programs include, but are not limited to, Medicare, Medicaid, TRICARE/CHAMPUS and CHAMPVA. Although there are numerous federally funded health insurance programs, the Medicare and Medicaid programs account for the majority of government spending in this area.

18.    Providers have an obligation not to submit claims to federal health care programs for non-covered costs or non-chargeable services disguised as covered or chargeable. 32 C.F.R. § 199.9(c)(2). Likewise, claims that are fictitious, or include or are supported by any written statement that asserts a material fact that is false, or include or are

---

[5] *Id.*

supported by any written statement that omits a material fact that the provider had a duty to include and the claim is false as a result of such omissions are prohibited.  32 C.F.R. § 199.2.

**A. Medicare**

19.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program.  Medicare is a health financing program that pays for the costs of certain services and care provided to eligible aged and disabled beneficiaries.  42 U.S.C. §§ 426, 426A.

20.     The Medicare Program  is comprised of four (4) parts, Medicare Parts A, B, C, and D.  Medicare Part B is directly at issue in this case.  The United States, through HHS, administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395j-1395w-4 ("Medicare Part B Program").  HHS has delegated the administration of the Medicare program to its component agency, CMS.

21.     The Medicare Part B Program is a federally-subsidized health insurance system for disabled people and people who are 65 years of age or older.  Eligible people may enroll in the Medicare Part B Program to obtain benefits in return for payments of monthly premiums as established by HHS.  In general, the Medicare Part B program pays for covered services, including air ambulance transport services, which are based upon a fee schedule.  42 U.S.C. §§ 1395j-1395w-4.  A beneficiary who is furnished a covered medical service can either pay for the medical service directly and request Medicare reimbursement, or assign the right to reimbursement to the supplier providing the service, which collects as an assignee of the beneficiary under 42 U.S.C. § 1395u(b)(3)(B)(ii).

22.     Payments under the Medicare Part B Program are often made directly to service providers or suppliers, such as air ambulance services, rather than to the patient who

is the Medicare beneficiary.  This occurs when the provider or supplier accepts assignment of the right to payment from the beneficiary.  In that case, the provider or supplier submits its bill directly to Medicare for payment.

23.     The United States reimburses Medicare claims from the Medicare Trust Fund through CMS, which in turn contracts the task of processing and paying Part B claims to private insurance carriers under 42 U.S.C. § 1395u.  Those carriers, referred to by CMA as Medicare Administrative Contractors ("MACs") are also authorized to conduct audits to ensure that proper payments are made to suppliers of services.  *See* 42 U.S.C. § 1395u(a)(1)(C); 42 C.F.R. § 421.200(e).  Because of the volume of claims they must process, MACs generally pay providers' or suppliers' claims for services in the first instance based on the provider's or supplier's representation that the service is billable under the applicable Medicare coverage rules.

### a.  Air Ambulances and Medicare

24.     Air ambulance service providers routinely bill tens-of-thousands of dollars for a single flight, only to have federal health care programs or other insurers refuse to pay the exorbitant rates.  When those programs or insurers ultimately agree to pay only a small fraction of the original air ambulance bill, air ambulance service providers sometimes pursue the patients they transported for the difference.  This practice leaves many patients purportedly owing tens-of-thousands of dollars to the service providers.  Air Methods engages in this practice.

25.     Medicare Part B does not pay for medical services, including air ambulance services, unless they are reasonable and necessary for the diagnosis or treatment of illness or injury.  42 U.S.C. § 1395y(a)(1)(A).

26.     In the context of air ambulance transports, Medicare Part B will pay for such services only if the patient's medical condition is such that all other forms of transportation are medically contraindicated.  42 C.F.R. 410.40(d)(1).

27.     Medically appropriate air ambulance transportation is a covered service only if the patient's medical condition is such that transportation by either basic or advanced life support ground ambulance is not appropriate.  Medicare Benefit Policy Manual, Chapter 10, Section 10.4.

28.     Air ambulances fall into two categories under Medicare Part B standards: "fixed wing" and "rotary wing" air ambulances.  Fixed and rotary wing air ambulance transports may be necessary because the patient's condition requires rapid transport to an appropriate treatment facility, and either great distances or other obstacles, *e.g.*, heavy traffic, preclude such rapid delivery to the nearest appropriate facility.  Transport by fixed wing or rotary wing air ambulance may also be necessary because the patient is inaccessible by a ground or water ambulance.  Medicare Benefit Policy Manual, Chapter 10, Section 10.4.

29.     Medical reasonableness for air ambulance transport coverage purposes is only established when the patient's condition is such that the time needed to transport a patient by ground, or the instability of transportation by ground, poses a threat to the patient's survival or seriously endangers the patient's health.  Medicare Benefit Policy Manual, Chapter 10, Section 10.4.2.  The Medicare Benefit Policy Manual, at Section 10.4.2 lists examples of circumstances when air ambulance transportation could be justified: intracranial bleeding requiring neurosurgical intervention; cardiogenic shock; burns requiring treatment in a burn center; conditions requiring treatment in a Hyperbaric Oxygen Unit; multiple severe injuries; or life-threatening trauma.

30.     The Medicare Benefit Policy Manual provides that, "there are very limited emergency cases where ground transportation is available but the time required to transport the patient by ground as opposed to air endangers the beneficiary's life or health." Medicare Benefit Policy Manual, Chapter 10, Section 10.4.3.

31.     Air ambulance transport is covered for transfer of a patient from one hospital to another if the medical appropriateness criteria are met, that is, transportation by ground ambulance would endanger the patient's health and the transferring hospital does not have adequate facilities to provide the medical services needed by the patient. Medicare Benefit Policy Manual, Chapter 10, Section 10.4.4. The Medicare Policy Manual, at Section 10.4.4 lists examples of such specialized medical services that are generally not available at all types of facilities: burn care; cardiac care; trauma care; and critical care.

32.     At all relevant times, Air Methods was a participating air ambulance supplier in the Medicare Part B program.

33.     From the time it became a participating provider, Air Methods submitted claims to federal health care programs, including Medicare Part B, for air ambulance services. It submitted these claims to CMS or its MACs throughout the United States. In order to bill Medicare Part B, Air Methods submitted electronic or hard-copy claim forms called CMS-1500 claim forms.

34.     At the time each hard-copy CMS-1500 form was submitted, Air Methods certified that the services for which it sought payment were "medically indicated and necessary for the health of the patient."

35.     Similarly, in order to submit electronic claims to CMS and its MACs, Air Methods executed one or more Electronic Data Interchange Enrollment Agreements in which it agreed to submit claims that are accurate, complete, and truthful.

**B. Medicaid**

36.     HHS, through CMS, also administers the Medicaid program, created in 1965 under Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, to provide federally-funded health insurance to indigent persons whose incomes are insufficient to meet the costs of necessary health care.  In Kentucky, for example, the Medicaid program has been established pursuant to Kentucky Revised Statutes (KRS) Chapter 205 and administrative regulations set forth in 907 Kentucky Administrative Regulations (KAR) Chapter 1.   In Kentucky, the Kentucky Cabinet for Health and Family Services, Department of Medicaid Services, administers the Medicaid program ("Kentucky Medicaid").    All states that participate in the Medicaid program have comparable oversight agencies and have promulgated similar state statutes and regulations.

37.     Funding for Medicaid is shared between the federal government and those states participating in the Medicaid program.  Approximately 70% of each dollar spent by state-run Medicaid programs is contributed by the federal government pursuant to Title XIX of the Social Security Act.

38.     Individuals or entities who are participating providers in state-run Medicaid programs, such as Air Methods, may seek reimbursement from the programs for services rendered to patients who are program beneficiaries, provided that the services are rendered in compliance with the laws, rules, regulations, policies, and procedures governing reimbursement.

    **a.**     **Air Ambulances and Medicaid**

39.     Kentucky Medicaid covers emergency air ambulance transportation only when the service is medically necessary.   907 KAR 1:060, Section 3(1)(a).   Kentucky Medicaid covers non-emergency air ambulance transportation only when the following three

conditions are met: (1) the patient's medical condition warrants transport by stretcher; (2) the patient is traveling from a Medicaid-covered service (exclusive of pharmacy service); and (3) the service is the least expensive available transportation for the patient's needs. 907 KAR 1:060, Section 4(1)(a)-(c). As do many states, Kentucky requires providers of air ambulance services to maintain records from treating physicians or medical professionals that establish the necessity of the transport. Those records must include justification for the air ambulance transport including, *inter alia*, description of: a medical condition which contraindicated transportation by other means; a patient's condition that required movement by stretcher; or a patient who was confined to a bed before and after a transport. 907 KAR 1:060, Section 5.

40.     At all times relevant to the events described in this Complaint, Air Methods was an enrolled provider in Kentucky Medicaid and numerous other states' Medicaid programs. Similar to Kentucky, other states' Medicaid programs do not pay for air ambulance transports unless they are reasonable, medically necessary, and other less costly modes of transportation are contraindicated. Air Methods submitted or caused to be submitted claims to these Medicaid programs for air ambulance services provided to the programs' beneficiaries. Such claims contained assertions and assurances that Air Methods' claims complied with applicable state Medicaid standards.

### C. Other Federal Health Care Programs

41.     The federal government also provides reimbursement for medical care, such as air ambulance services, under other health care programs.

42.     The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (presently entitled "TRICARE"), 10 U.S.C. §§ 1071-1106, is a federally-funded program administered by the Department of Defense. TRICARE/CHAMPUS

provides medical benefits to certain active duty service members and their spouses and unmarried children, certain retired service members and their spouses and unmarried children, and reservists called to duty and their spouses and unmarried children. 32 C.F.R. § 199 *et seq.* TRICARE pays only for its beneficiaries' medically necessary and reasonable ambulance transports.

43.     CHAMPVA is a healthcare program administered by the United States Department of Veterans Affairs for families of veterans with 100 percent service-connected disabilities. CHAMPVA pays only for its beneficiaries' medically necessary and reasonable ambulance transports.

44.     The Federal Employees Health Benefits Program ("FEHBP") provides health care coverage for qualified federal employees and their dependents. FEHBP pays only for its beneficiaries' medically necessary and reasonable ambulance transports.

45.     Indian Health Service ("IHS"), a division of the Department of Health and Human Services, is the federal program for American Indians and Alaska Natives. The Indian Health Care Improvement Act of 1976 allows HIS, under some circumstances, to pay for its beneficiaries' medically necessary and reasonable ambulance transports.

46.     The coverage and reimbursement criteria of these other federal health care programs mirror those of Medicare and Medicaid. The services provided beneficiaries must be reasonable and medically necessary. Health care providers are not permitted to seek reimbursement for services that are not reasonable or medically necessary.

## V.    APPLICABLE LAW

### A.  False Claims Act

47.    The federal FCA, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim made, is liable to the United States for a civil money penalty of $5,000 to $10,000 per false claim (as adjusted for inflation), plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

48.    The federal FCA also provides that any person who conspires to violate any provision of the Act is liable to the United States for a civil money penalty, plus treble damages. 31 U.S.C. § 3729(a)(1)(C).

49.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). These terms "require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

50.    The term "claim" is defined to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such

contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

51.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.  31 U.S.C. § 3729(b)(4).

## VI.     DEFENDANT'S WRONGFUL CONDUCT

### A. Basis for Relator's Information

52.     In 2008, Scott Crum began working for Air Methods as a flight nurse.  He was promoted to senior regional float nurse in 2013.  He has been steadily employed with Air Methods since his 2008 hiring.  Mr. Crum has received training from Air Methods and has interacted with multiple levels of company management concerning company policies and procedures, including those relating to patient transportation decisions and the implications that documentation of such have on billing to governmental and private insurers, among other topics.

53.     One of Mr. Crum's chief functions for Air Methods has been to act as one of two medical professionals on the company's three-person air ambulance flight crews.  The crews are typically made up of a non-medically trained pilot, a paramedic, and a registered nurse.

54.     Air Methods' flight crews are mainly based out of local airports or "flight bases," as Air Methods calls them.  Those flight bases are staffed with full-time Air Methods employees.  The flight bases' staffing levels are supplemented by "regional float nurses" like Mr. Crum who fill in for or relieve other flight crew members as needed.  His role as a senior regional float nurse has given Mr. Crum the opportunity to serve on Air Methods flight crews in Kentucky, Michigan, Ohio, Tennessee, Indiana, New Mexico, Arizona, Colorado,

Texas, Georgia, and New York. He has treated or assessed approximately 500 patients for Air Methods and has prepared and/or reviewed records relating to the care, condition, and transportation of those patients as well as many others. In whatever states that he has flown for Air Methods, and regardless of patient demographics, Mr. Crum has seen the same consistent pattern of fraud.

55.     Through his work reviewing Air Methods' patient charts and associated records, Mr. Crum found evidence corroborating what his above-referenced hands-on work, training, and management interaction had already shown him:  Air Methods' staff and management are well aware that unreasonable and unnecessary air ambulance flights are occurring and that claims are routinely submitted to federal health care programs for such flights.  Instead of being trained and encouraged to make air ambulance transportation decisions based upon a fair, case-by-case assessment of patient conditions, surrounding circumstances, and applicable federal health care program standards, Mr. Crum and other Air Methods employees are cajoled into doing the opposite – applying a "fly patients at all costs" mentality and, worse still, creating records falsely justifying such patient transports.

56.     In sum, Mr. Crum's work on Air Methods' flight crews across the United States, as well as his receipt of training, peer reviews, managerial feedback and correction, and his own review of records, revealed that a consistent, corporate set of fraudulent practices and protocols are in place throughout Air Methods' coverage footprint that are designed to get Air Methods paid by federal health care programs for unreasonable and unnecessary services that, but for the fraud, should not and would not be paid.

**B.  Corporate Culture of Fraud**

57.     Not long after he became employed by Air Methods in 2008, Mr. Crum noticed that once an Air Methods flight crew took off in either a fixed wing (airplane) or

rotary wing (helicopter) air ambulance, there was an extreme likelihood that the patient connected with the dispatch would, indeed, end up being transported via air ambulance. Despite the fact that Medicare and Medicaid standards (referenced throughout this Complaint) set high hurdles to cross before air ambulance transportation may be deemed reasonable and medically necessary, Mr. Crum saw, time and again, instances wherein patients were flown by air ambulance when circumstances and/or patient conditions did not justify such. Air Methods' employees were not making determinations on critical questions like, "Is the patient's medical condition such that all other forms of transportation are medically contraindicated?" Instead, Air Methods' flight crews and managers applied a mindset and protocols designed to get Air Methods paid nearly every time one of its air ambulances encountered a patient, regardless of medical necessity or reasonableness.

58. Indeed, Mr. Crum was instructed by a superior to the effect that, "Your job is not to question the decision of the person who called for the flight. Your job is to transport the patient – period." At times, when Mr. Crum and others would contact managers about concerns over how to word descriptions of unjustified flights that nevertheless occurred, managers would repeat instructions that had been given previously, namely to emphasize the distance involved in the transport and to say that ground-based EMS or physicians had ordered the flight.

59. Mr. Crum saw records being created by Air Methods' staff that falsely recorded symptoms, conditions, circumstances, and environmental factors that either did not exist at all, or did not exist to the degree recorded – all for the purpose of falsely justifying air ambulance services that should not have been performed and should not have been claimed for payment to federal health care programs.

60.     Through his interactions with paramedics and other first responders, Mr. Crum learned that ground-based first responders sometimes called for air ambulance services for inappropriate reasons like:  (1) local ground ambulance paramedics/staff did not want to drive long distances; (2) ground ambulance services did not want to tie up their vehicles or take them out of county; (3) ground ambulance paramedics/staff were sometimes simply lazy; (4) ground ambulance services hoped to pass along legal liability to air ambulance services; (5) ground-based first responders misunderstood the standards pertaining to when air ambulance services were appropriate; and (6) ground-based first responders sometimes overreacted to patient symptoms or other circumstances.  Air Methods employees were discouraged by management from counseling with first responders, hospital staff, and other health care professionals in any way that might reduce the vigor of air ambulance calls, no matter how frivolous.  Whenever Mr. Crum brought up such concerns, he was generally met with managerial responses to the effect of, "Your job is to transport the patients that we are called to transport."

61.     Early in his career, Mr. Crum was afraid to speak up about the fraud because of his neophyte status with Air Methods and because of his relative inexperience in air ambulance services, in general.  Later in his career, Mr. Crum had received enough management intervention, admonishment, and outright instruction to falsify records and to approve flights contrary to federal and state law to know that, if he wanted to keep his job, he had better go along with the program, so to speak.

62.     Over time, Mr. Crum was instructed by various managers to change records relating to specific patient flights.  These instructions sometimes came through face-to-face conversations.  Other times, in the face of wholly truthful and complete accounts in records generated contemporaneously with patient care and assessment, Air Methods' management

team members would give Mr. Crum and other employees instructions that amounted to, "Do not ever write that in a chart. If we get audited, the claim for this flight will get reversed because the patient does not seem to be in distress. Instead, write something like this…."

63.     As another example, Crew members were routinely confronted for recording "zero" in relation to a patient's pain level, even when that was actually what the patient reported. Employee acquiescence to such managerial edits to records would invariably result in inaccurate, fraudulent accounts of circumstances and/or patient conditions. In context, these instructions and admonitions were designed to ensure that Air Methods' claims for payment for unreasonable and unnecessary flights got paid by federal health care programs and other insurers, even though truthful accounts of the circumstances would have resulted in non-payment.

64.     Typifying the state of affairs, Mr. Crum was once confronted by Air Methods' Medical Director, who was upset that Mr. Crum had written a truthful quotation from a patient who had been transported by air ambulance. Mr. Crum quoted the patient, who was at that moment responding well to treatment, as having said something to the effect of, "I feel good enough to go to work." The Medical Director, in a threatening tone, said words to the effect of, "Don't you ever document what a patient says in a chart. Putting things like that in a chart makes it look bad for us."

65.     Instead of using its peer review and other internal processes as means of identifying and reversing improper claims, Air Methods uses those processes, its training programs, and other carrot-and-stick methods as means of refining its fraudulent craft – of instructing staff on how to better justify the unjustifiable. Virtually every flight is subjected to some form of peer or managerial review. When these reviews result in facets of care or

flight decisions being deemed to be questionable, they are placed into a system of "Utilization Review Committee" databases, generally organized by state, where they are eventually subjected to additional managerial scrutiny.

66. This managerial or committee review normally occurs after claims have been submitted to federal health care programs. Based upon Relator's experience and information and belief, when reviewing managers deem flights to have not met applicable flight criteria, they log those findings in the Utilization Review Committee database; but the claims for such flights are not reversed. Upon information and belief, Air Methods normally keeps the federal program money even when its internal review processes determine that a flight was not necessary or reasonable.

67. When the review process results in a finding that a particular flight was outside of applicable flight criteria, Air Methods' managers sometimes place referring and receiving agencies (*i.e.*, the agencies who call for air ambulances and those who accept the patients for treatment, respectively) on an internal "watch list". However, based upon Relator's experience, placement of such providers on the company's internal watch list has no meaningful effect. It does not restrict the providers' abilities to call for air ambulances. Based upon Relator's knowledge and experience, no flight requests are ever denied based upon how many times a referring agency has been flagged on a watch list. Indeed, as is highlighted by Exhibit 1 (Screenshot from Utilization Review Committee Findings), flights still occurred without hesitation for a provider that, for example, had been placed on the watch list 35 times. Upon information and belief, the watch list has no meaningful effect in terms of preventing unreasonable and unnecessary patient flights. Rather, it seems to be designed, at least in practice, to give Air Methods some measure of plausible deniability and to mask its culture of fraud.

### C. Training Designed to Promote Fraud

68.   Managers routinely admonished flight crew members to embellish or exaggerate information in patient charts.  In addition to the sorts of instructions referenced in the "Corporate Culture of Fraud" section of the Complaint, above, managers informally trained Mr. Crum and other employees to include certain phrases in patient charts that were viewed as helpful to getting claims paid by federal and private payors, as well as protecting the company from later audits.  Managers trained flight crew members to write phrases like, "called to scene per EMS judgment."  This phrase tended to act as third-party corroboration of the flight crew's decision to ultimately transport a patient by air ambulance.  Crews were encouraged to cite "long distance to trauma center" and similar rationales even when patient conditions were so objectively stable as to make distance to a facility a veritable non-factor. In the context of non-emergency hospital-to-hospital air ambulance transports, employees were again trained by managers to use phrases like, "air transport was utilized due to severity of illness or injury and long distance to treating facility".  To be clear, employees were trained by their managers to use these phrases whether or not they were true under a particular patient's circumstances.

69.   Air Methods' managers scrutinized the records prepared by flight crews for virtually every patient flight.  After such scrutiny, managers would routinely warn crew members about the phraseology that they utilized, particularly in certain sections of the records.  Concerning Page Two of Air Methods' "EMS Charts" (pertaining to patient history and physical condition), for example, managers would often say things to flight crew members like, "This section is where claims get paid or denied."  Those statements would often be juxtaposed with instructions and training designed to cause crew members to write

materially misleading information in this section.  Similar circumstances also pervaded Page 8 (the global narrative section) of Air Methods' "EMS Charts".

70.    In addition to this sort of informal indoctrination from their superiors, Air Methods staff members were also specifically and formally trained to commit fraud designed to ensure Air Methods would be paid on claims for flights that were not medically necessary or reasonable.  As recently as 2017, for example, Air Methods' formal, written, company-wide training modules on preparing medical records instructed members of air ambulance flight crews that, "It's important to not feed info on how stable the patient is."  Those same materials encouraged employees to "think differently" about entering data into medical records and that "'stable' or 'resting comfortably' or 'sleeping in no apparent distress' are hard to defend."  Instead of those phrases, the training materials instructed employees to say, "patient re-assessed with no clinical changes."  Exhibit 2 (Training Slides) of this Complaint highlights these sorts of explicit and implicit instructions to commit fraud.

### D.  Patient Examples

71.    Mr. Crum recalls numerous instances when Air Methods' staff provided unreasonable and unnecessary air ambulance services to patients and took steps to trigger Air Methods' standard billing processes, which resulted in the submission of false claims to federal health care providers and other insurers for such services.  Examples of such instances include: (1) an ambulatory patient suffering from a minor .22 caliber gunshot wound to the webbing of his big toe, was picked up from one hospital and flown to another hospital (upon arrival at the first hospital – *i.e.,* before the flight – the Air Methods' crew caught the patient in the throes of a vigorous intimate physical encounter with his girlfriend in his examination room); (2) a teenager in no physical distress, suffering only from non-emergency mental health issues, was transported via airplane from one facility to another for

a pre-planned evaluation; (3) multiple patients in no distress were nevertheless flown to trauma centers, only to be discharged before the air ambulance could even make it back to its flight base; and (4) a child with a possible, but unlikely ankle fracture, in no apparent distress, was flown to a local hospital.   Other specific examples backed up by medical records (collectively attached as Exhibit 3) include:[6]

### a.   Patient "L.B."

72.   L.B. was a 72 year-old Medicare patient.  On or about August 21, 2015, L.B., who had previously had one leg partially amputated, fell out of his wheelchair, injuring his nose and back.  He displayed no neurologic deficits, other than those that pre-existed the fall.  Upon examination, Air Methods' flight crew based out of Hazard, Kentucky noted no significant injuries and the patient was not otherwise in distress.  This patient's circumstances lacked any justification for air ambulance transportation under applicable program standards. L.B. was nevertheless transported via air ambulance from the scene.  Upon information and belief, Air Methods submitted a claim for payment connected with this flight to a federal health care program within a few days of the services being rendered.  Because this flight was unreasonable and medically unnecessary, the claim submitted for these services was false.

### b.   Patient "R.W."

73.   R.W. was a 93 year-old Medicare patient.  On or about August 12, 2015, an Air Methods air ambulance based in Hazard, Kentucky was dispatched to Louisa, Kentucky by a ground-based ambulance service relative to a possible stroke patient.  Upon arrival, Air Methods' flight crew assessed R.W. and found no symptoms of stroke.  The crew determined that R.W. had experienced vasovagal syncope (*i.e.*, he had passed out and slipped

---

[6] Not every example provided involves a patient known to be insured by federal health care programs.  A couple of the exemplar patients' insurance statuses are uncertain, but are nevertheless listed to illustrate the variety and expanse of Air Methods' turn-no-opportunity-away mentality.

from the toilet during a constipated bowel movement). The closest hospital capable of safely treating R.W. was Three Rivers Medical Center in Louisa, Kentucky – just a five minute drive from the site to which ground-based paramedics had summoned the air ambulance. This patient's circumstances lacked any justification for air ambulance transportation under applicable program standards. The patient was nevertheless transported via air ambulance. Upon information and belief, Air Methods submitted a claim for payment connected with this flight to a federal health care program within a few days of the services being rendered. Because this flight was unreasonable and medically unnecessary, the claim submitted for these services was false.

### c.    Patient "V.C."

74.    V.C. was a 65 year-old Medicare patient. On or about April 10, 2017, an Air Methods air ambulance based in London, Kentucky was dispatched to the Corbin, Kentucky Civic Center in regard to a patient who was feared to be having a stroke. Upon arrival, the Air Methods flight crew determined that V.C. was not having a stroke. V.C. was agitated but conversant, and did not display stroke-like or any other neurologic symptoms. Rather, the flight crew determined that V.C. had taken too much of her Lortab (a pain medication). This was something that V.C. had reportedly done before. This patient's circumstances lacked any justification for air ambulance transportation under applicable program standards. Indeed, a ground-based ambulance could have transported V.C. to a suitable nearby hospital in less than 15 minutes for follow-up care. The patient was nevertheless transported via air ambulance from the scene. Upon information and belief, Air Methods submitted a claim for payment connected with this flight to a federal health care program within a few days of the services being rendered. Because this flight was unreasonable and medically unnecessary, the claim submitted for these services was false.

### d.    Patient "B.C."

75.    B.C. was a 51 year-old Medicare/Medicaid patient.  On or about May 30, 2010, an Air Methods air ambulance based in London, Kentucky was dispatched to Manchester Memorial Hospital for an inter-facility transport to the University of Kentucky Hospital in Lexington, Kentucky.   B.C. was initially admitted to Manchester Memorial Hospital, Manchester, Kentucky, over complaints of generalized weakness.  B.C. was being transferred to the University of Kentucky Hospital for additional testing.   B.C. showed no signs of distress and needed no specialized care during the one-hour flight between hospitals.  This patient's circumstances lacked any justification for air ambulance transportation under applicable program standards.  The patient was nevertheless transported via air ambulance. Upon information and belief, Air Methods submitted a claim for payment connected with this flight to a federal health care program within a few days of the services being rendered. Because this flight was unreasonable and medically unnecessary, the claim submitted for these services was false.

### e.    Patient "K.B."

76.    K.B. was a 14 year-old patient.  Upon information and belief, K.B. was insured through Medicaid.  On or about September 6, 2015, an Air Methods air ambulance based in Hazard, Kentucky was dispatched to Perry County, Kentucky due to a call from a ground-based ambulance service.  Upon arrival, Air Methods' flight crew found K.B. to be suffering from a second-to-third degree burn over four percent (4%) of K.B.'s lower right forearm. K.B. explained that a splash of liquid from a kettle on a stove caused the burn.  This patient's circumstances lacked any justification for air ambulance transportation under applicable program standards.   Although K.B. had a burn, which can under some circumstances justify air ambulance transport, this minor burn did not justify such.  The

patient was nevertheless transported via air ambulance. Upon information and belief, Air Methods submitted a claim for payment connected with this flight to a federal health care program within a few days of the services being rendered. Because this flight was unreasonable and medically unnecessary, the claim submitted for these services was false.

      f.    **Patient "Ro.Ga."**

77.    Ro.Ga. was a 37 year-old patient. On or about August 1, 2015, an Air Methods air ambulance based in Hazard, Kentucky was dispatched to rendezvous with a ground ambulance, its crew, and Ro.Ga. at a predetermined landing zone in Leslie County, Kentucky. Ro.Ga. reported to the Air Methods crew, "I burnt my left hand last week." Follow-up investigation by the flight crew revealed that Ro.Ga. grabbed a hot skillet eight days earlier, had declined to seek treatment immediately after the burn, and now eight days later was refusing the ground ambulance's offer to drive him to nearby hospitals for initial evaluation and treatment. The distance to a hospital with plastic surgeon and hand specialist capabilities was deemed to be 50 minutes by air ambulance and 130 minutes by ground ambulance. This patient's circumstances lacked any justification for air ambulance transportation under applicable program standards. Although Ro.Ga. had a burn, which can under some circumstances justify air ambulance transport, neither the eight day-old injury nor the patient's refusal to cooperate with ground-based paramedics was a justification for air ambulance services. The patient was nevertheless transported via air ambulance.

      g.    **Patient "Ra.Gr."**

78.    Ra.Gr. was a 90 year-old Medicare patient. On or about April 2, 2017, an Air Methods air ambulance based in London, Kentucky was dispatched to Manchester Memorial Hospital for an inter-facility transport to Saint Joseph Hospital in Lexington, Kentucky. Ra.Gr. was initially admitted to Manchester Memorial Hospital, Manchester, Kentucky, for a

gall stone with bile duct obstruction. Ra.Gr. was being transferred to Saint Joseph Hospital because Manchester Memorial lacked the surgical capabilities to treat Ra.Gr. Despite the facts that several closer hospitals had such surgical capabilities and Ra.Gr.'s circumstances lacked any justification for air ambulance transportation under applicable program standards, the patient was nevertheless transported via air ambulance to Saint Joseph Hospital. Upon information and belief, Air Methods submitted a claim for payment connected with this flight to a federal health care program within a few days of the services being rendered. Because this flight was unreasonable and medically unnecessary, the claim submitted for these services was false.

        **h.**      **Patient "E.N."**

79.    E.N. was a 57 year-old Medicaid patient. On or about March 13, 2017, an Air Methods air ambulance based in Mt. Sterling, Kentucky was dispatched to Manchester Memorial Hospital for an inter-facility transport to the University of Kentucky Hospital in Lexington, Kentucky. E.N. was initially admitted to Manchester Memorial Hospital, Manchester, Kentucky, for general weakness that had reportedly lasted the four preceding days. E.N. was being transferred to the University of Kentucky Hospital because of family concern that E.N. might be having a stroke. Upon arrival at the hospital in Manchester, Air Methods' flight crew found E.N. to be in no distress. They noted that she was showing no new neurologic or physical deficits that might be indicative of stroke. In fact, the stroke assessment generated negative results, meaning that E.N. was not having a stroke. Other than generalized weakness lasting four days, E.N. complained of no additional symptoms. This patient's circumstances lacked any justification for air ambulance transportation under applicable program standards. The patient was nevertheless transported via air ambulance. Upon information and belief, Air Methods submitted a claim for payment connected with

this flight to a federal health care program within a few days of the services being rendered. Because this flight was unreasonable and medically unnecessary, the claim submitted for these services was false.

## VII.   DAMAGES

80. The United States has been damaged by the acts and practices of Defendant, as described above, in presenting, causing to be presented, and conspiring to present false claims, statements, and records to induce the payment for medically unnecessary and unreasonable air ambulance services.

81. Defendant's false statements were material to the decision of the United States to cover and reimburse Defendant for the medically unnecessary and unreasonable air ambulance services described herein.

82. Defendant profited unlawfully from the payment of the claims.

83. Damages to the federal and state governments are substantial.

## COUNT I

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)
### (Knowing Presentation of False Billing Records for Payment)

84. Relator restates and re-alleges the allegations contained in Paragraphs 1-83, above, as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

85. The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval . . .

is liable to the United States Government for a civil penalty of not less than $[5,500] and not more than $[11,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person . . .

86. By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment of medically unnecessary and unreasonable air ambulance services. Defendants knew that these claims for payment or approval were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

87. Each claim presented or caused to be presented for reimbursement for the medically unreasonable and unnecessary air ambulance services represents a false or fraudulent claim for payment under the FCA.

88. Unaware that Defendant submitted false statements to conceal its illegal and fraudulent behavior, the United States and the States paid and continue to pay the false claims submitted for Defendant's services. These claims would not have been paid but for Defendant's fraud and false statements.

89. In reliance on the accuracy of Defendant's data, representations, and certifications, the United States and the States have paid said claims and have suffered financial losses because of these acts by Defendant.

## COUNT II

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)
### (Knowing Creation of False Records)

90. Relator restates and re-alleges the allegations contained in Paragraphs 1-89, above, as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

91. The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .
>
> is liable to the United States Government for a civil penalty of not less than $[5,500] and not more than $[11,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person . . .

92. By virtue of the acts described herein, Defendant knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment of medically unnecessary and unreasonable air ambulance services that did not accurately reflect the circumstances surrounding the services. Defendant knew that these claims for payment or approval were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

93. Each claim presented or caused to be presented for reimbursement for the medically unreasonable and unnecessary air ambulance services set forth herein represents a false or fraudulent claim for payment under the FCA.

94. Unaware that Defendant submitted, or caused to be submitted, false records and/or statements to conceal its illegal and fraudulent behavior, the United States and the States paid and continue to pay the false claims submitted for Defendant's services. These claims would not have been paid but for Defendant's fraud and false statements.

95. In reliance on the accuracy of Defendant's data, representations, and certifications, the United States and the States have paid said claims and have suffered financial losses because of these acts by Defendant.

**PRAYER AS TO COUNTS I & II**

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and the United States and against Defendant in Counts I and II, respectively, for the following:

a.      Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of each Defendant's conduct;

b.      Civil penalties against the Defendant equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729;

c.      The fair and reasonable sum to which Relator is entitled under 31 U.S.C. § 3730(b); additionally, Relator is entitled, in equity, to recover attorney's fees from the fund created for non-participating beneficiaries (those not contributing material time and expense to generating any settlement or recovery from a Defendant) under the Common Fund doctrine to be paid from the recovery fund generated for such non-participatory beneficiaries from the Defendant;

d.      All costs and expenses of this litigation, including statutory attorney's fees and costs of court;

e.      Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.      Relator's individual damages, if any, which may be alleged; and

g.      All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Relator demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution.

DATED:  August 8, 2018

Respectfully submitted,

Brandon W. Marshall
NASH MARSHALL, PLLC
129 West Short Street
Lexington, Kentucky 40507
(859)254-3232
bwmarshall@nashmarshall.com

## VERIFICATION

I, Scott Crum, Plaintiff/Relator, have read the foregoing *Qui Tam* Complaint and Jury Trial Demand, and hereby verify and confirm that the statements and representations contained herein are true and correct to the best of my knowledge and belief.

_____
Scott Crum


COMMONWEALTH OF KENTUCKY            )
                                    )
COUNTY OF Boyd                      )


Subscribed, sworn to and acknowledged before me by Scott Crum this _8_ day of August, 2018.

My commission expires: ___3-11-20___

MELISSA K LOGAN
NOTARY PUBLIC - KENTUCKY
MY COMM. EXP. 03/11/2020

_____
NOTARY PUBLIC, State at Large

35

## **CERTIFICATE OF SERVICE**

This is to certify that the original of the foregoing was hand delivered on this the 8th

day of August, 2018, to:

Office of the Clerk
United States District Court
Eastern District of Kentucky
101 Barr Street
Lexington, KY 40507

This is to further certify that a true and correct copy of the foregoing was mailed via

U.S. Mail, postage prepaid, on this the 8th day of August, 2018, to:

Jefferson Beauregard Sessions, III
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530-0001

This is to further certify that a true and correct copy of the foregoing was hand-

delivered, on this the 8th day of August, 2018, to:

Robert Michael Duncan, Jr.
U.S. Attorney
Eastern District of Kentucky
260 West Vine Street, Suite 300
Lexington, KY 40507

_____
Counsel for *Qui Tam* Plaintiff/Relator